Brief of Griffith & Quitman.
1 H. Bl. 685, 689; 6 Broun, P. C. 550. — Balfour vs. Scott. — In this case it was determined that in the case of a Scotchman dying intestate domiciled in England, his personal estate must be distributed according to the law of England; and moreover,'even when by the law of Scot land an heir would be obliged to collate, before he could claim a part of the personal estate; this would not be the case where the intestate had his domicil in England.
2 Bos. & Pul. 229; 566. — Bruce vs. Bruce. — In this case which has since become a leading one it was established that in the distribution of personal estate it is the lex domicilii which is to govern.
This is a principle likewise of the civil law and a part of the law of nations.
Vattel, Book 2. chap. 8 sec. 110, lays it down in express terms, that the personal property of a stranger dying intestate, ought to be distributed according to the laws of his own country, or that where he is domiciled; but immovables must go according to the lex lacirei sitae.
Voct. lib. 38, tit. 17, sec. 34. — To the same effect.
Haberus, who was a judge of the Supreme Court of Friesland in his .celebrated work, called Prelectiones Juris Civilis et Hodiemi, states the law of his country thus,
Huberus, part 1, books, tit. 13, sec. 219.— “We cannot omit a question of frequent occurrence in our courts; although comparatively un *282 known to the Roman law. It often happens that a different rule of succession to the estate of intestates prevails in the place where the deceased had his domicil, and in those places where his- property is situated; and it has been made a question by what systemof laws the succession is to be regulated; the general and correct opinion is, that as to immoveables, we must presume the laws of the place where they are situate, because, as they form a part of the domain or territory, they cannot be governed by the laws of a different jurisdiction — but in relation to moveables there is no reason why we should not follow the law of the domicile because moveables have no affinity to the soil, but only to the person of the owner, who cannot be presumed to have wished any other disposition of them, than the one which prevailed in the place of his domicile” — And’ again in part 2, book 1, tit. 3, sec. 15. “Nor can a different rule prevail in successions to intestate’s estates. If the deceased was the head of a family, having goods or possessions in different parts of the empire, as to the immoveables, the law of the place where they are situated, must be ob" served, and as to the moveables the law of that place where the deceased had his domicile.”
. This also appears to be the law of France. — Denisart in his “ Collection de Jurisprudence,” word “ Domicile” sec. 3, 4, says, “ It is the do-micil which regulates the distribution of a moveable succession; thus if an individual dies, having his domicil at Paris his moveable succession will be regulated by and belong to those whom the custom of Paris will point out as his heirs.
Shortly after the determination of the cases of Bruce and Bruce— Hogg and Ashley and Balfour vs. Scott, in the House of Lords — this question again came up before the Lord Chancellor Loughborough in the case of Bempde vs. Johnstone, 3d Ves. Jur. 199. In one part of his opinion the Lord Chancellor says:
“ The point has been established in the cases in the House of Lords, which if it was quite new and open, always appeared tome to be susceptible of a great deal of argument, whether in the case of a person dying intestate having property in different places and subject to different laws; the law of each place should not obtain in the distribution of the property situated there; many foreign lawyers have held that proposition; there *283 was a time when the courts of Scotland certainly held so. The judgments in the House of Lords have taken a contrary course; that there can be but one law, they must fix the place of the domicil;— and the law of that country where the domicil is, decides, wherever the property is situated. That I take to be fixed law now.
The next case decided in the English courts was that of Somerville and Somerville, 5th Ves. junr. 750, in which the principle established in the foregoing cases is expressly recognised and established. The master of the rolls says,i£ That rule is, that the succession to the personal estate of an intestate, is to be regulated by the law of the country, in which he was a domiciled inhabitant at the time of his death, without any regard whatsoever, to the place either of his birth or death, or the situation of the property at that time.”
This case however contains a passage which it will be seen is very important in another aspect in which this case will be presented and which we shall here extract, deferring however any remarks upon it for the present. The master of the Rolls in page 789, in continuation of his opinion, says,
“ It is surprising that questions of this sort have not arisen in this country when we consider that until a very late period, and even now for some purposes, a different succession prevails in the province of York— The custom is very analogous to the law of Scotland. Till a very late period the inhabitants of York were restrained from disposing of their property by testament. The alteration may account for the very cases occurring, for very few persons of fortune die intestate — though it has happened in this case. — Before the power of disposing by testament such cases must have been frequent and the question then would have been whether during the time the custom and the restraint of disposing by testament were in full force; a gentleman of the county of York coming to London for the winter, and dying there intestate, the disposition of his personal estate should be according to the custom or to the general law ; one should suppose it hardly possible that some such case had not occurred; 1 directed a search to be made in the spiritual court and the court of chancery,where it was most likely .that such a case-would be found, but I do not find that any such case has occurred; some observations *284 may arise upon that custom. It may be thought there are some inaccuracies in the words of the statute upon it. The custom as it is stated to have existed, is thus expressed: that there is due to the widow and the lawful children of every man being an inhabitant or householder withinthe said province of Yorlc, and dying there or elsewhere intestate, being an inhabitant or house holder within that province, a reasonable part of his clear moveable goods, unless such child be heir to his father deceased or were advanced by his father in his lifetime-, by which advancemeat it is to be understood that the father in his lifetime bestowed upon his child a competent portion whereon to live. I observe the statute giving the power of disposing by testament, after reciting the custom directs, that it shall be lawful for any person inhabiting or residing, or who shall have any goods or chattels within the Province of York, to give, bequeath and dispose of all their goods, chattels, debts and other personal- estate. One would suppose from this, that the Legislature had some reference to the Lex loci rei sites, and that it was supposed the custom would attach upon any property locally situated there; though the party was not resident; and though it is now too late to doubt the Taw upon that. I have some reason to think our spiritual courts inclined as the courts of Scotland to the lex loci rei sites, and if the question had occurred in that court, and the authority of the House of Lords had not interfered, that would have been considered as the rule, and for this reason; that their jurisdiction is founded upon it, the distribution arising from the place where the property is situated, and it is natural for the judge who acquired his authority from the situation of the property, to suppose the rule should be that of the place where the property .is. But that now is certainly not the case.”
To the foregoing authorities extracted from adjudged cases, we will add one more extract from Huberus, which exhibits more at large the elementary principles upon which these doctrines are founded.
The same doctrines and principles have been recognized to their full extent in our own courts. In the case of Dawes, Judge & Co. vs. Boylston 9 Mass. 337. Judge Sewall in delivering the opinion of the court says, “ These facts and circumstances are also to be considered with a due regard to the general principles which have been urged apon the attention of the court, and to which wo shall readily adhere, as they have here *285 tofore been recognised and adopted in the decisions of this court. The rights of legatees, especially of residuary legatees as well as of the next of kin in a case of intestacy depend upon the laws of the country where the deceased had his home and domicil, from whom the bequest or succession is claimed, and to that purpose all the choses in action and personal effects are to be deemed local; to be there accounted for and finally administered, whenever collected or accruing in possession to the executor or administrator.
In .the case of Harvey vs. Richards, Story, justice, says, 1 Mass. 408 “ There are some points involved in the argument which may be disposed of in a few words. In the first place the distribution, whether made here or abroad,must be according to the law of the place of the testator’s- domi-cil. This, although once a question vexed with much ingenuity and learning in courts of law, is now so completely settled by a series of well considered decisions, that it cannot be brought into judicial doubt,” and again, in the same case, “ The rule that distribution shall be according to the law of the domicil of the deceased, is not founded merely on the notion, that moveables have no situs and therefore follow the person of the proprietor even interpreting that maxim, i'n its true sense, that personal property is subject to that law which governs the person of the owner. Nor is it perhaps founded on the presumed intention of the deceased, that all his property should be distributed according to the law of the place of his domicil, with which he is supposed to be best acquainted and. satisfied, for the rule will prevail even against the express intention of the deceased, unless the mode in which that intention is expressed, would give it legal validity as a will. It seems indeed to have had its origin in a more enlarged policy founded upon the general convenience and necessities of mankind, and in this view the maxim above stated flows from, rather than guides, the application of that policy. The only reason why any nation gives effect to foreign laws within its own territory, is the endless-embarrassment which would be otherwise introduced in its own intercourse with foreign nations. The rights of its own citizens would be materially impaired and in many instances totally extinguished by a refusal to re-cognise and sustain the doctrines of foreign law. Tho case now under consideration, is an illustration of the perfect justice and wisdom of this *286 general practice of nations. A person may have moveable property and debts in various countries each of which may have a different system of succession. If the law rei sitae were generally to prevail it would be utterly impossible for any such person, to know in what rpanner his property would be distributed at his death, not only from the uncertainty of its situation from its own transitory nature, but from the impracticability of knowing with minute accuracy, the law of succession of every country in which it might happen then to be.
The common and spontaneous consent of nations therefore established this rulo from the noblest policy, the promotion of general convenience and happiness and the avoiding of distressing difficulties equally subversive of the public safety and private enterprise of all.”
Brief of D. S. & R. J. WalkeR.
1. The general rule is that courts are governed by the municipal laws of their own country. A disregard of these laws, in favor of the law of the domicile, is an exception, which must not be carried beyond the reason in which it originated. The reason of this exception is, the mutual convenience and reciprocal comity of nations, and pre-supposes, that the nation asking the sacrifice of the municipal to the foreign law, would, on the same subject matter, reciprocate the comity. Otherwise the rule would cease to be international. 3 Dallas 370,371; Vattel. 55,57, 211; 1 Mason 411; 1 Bin. 344; G Bin. 377, 3C7; 5 Bin. 3S6, 339.
2. This exception being a mere comity, and not a right, each nation may abrogate or modify it. 4 Dunf. andEast 193; Codec. Jurid. 245; Vattel 230, 92,93,449; 3 Mas. 518; 1 Hen.'Blac. 793; G Bin. 3G1.
3. As courts adopt this exception without legislative enactment, so they may and do adopt it only so far as international comity and reciprocal eaurtesy require. Mutuality is considered by Judge Story, as the “only reasont4 for this exception: “Sub muture vicissitudinis obtentu, damus petimusque vicissim.” Reciprocal privileges constitute the basis of the whole international code. Now Louisiana classes slaves as immoveable, and refuses to distribute them according to our laws, and will this State yield to her, the tribute of unreciprocated privileges, or extend to her a courtesy, which she refuses to us. ’ 1 Bin. 344.
4. The domicil (as a general rule) determines the character of the *287 property, as movable, or immovable, neutral, or an enemy, but if the situs determines it, then the slaves of a Mississippian located in Louisiana, are regarded as immoveables, and the reciprocity abolished. Mobilia personam sequuntur, immobilia situm. 1 Bin. 344; Yattel 396,407.;
5. In adopting the law of the domicil, we entirely disregard the local and give full operation to' the foreign laws. Now these laws consider slaves immoveables, give them a situs, and consider them incapable of being attracted to the domicil. If the court only disregard the local laws as to the distribution, and not as to the character of the property, then if moveables are distributed differently at the domicil from immoveables, the slaves'of a Louisianian located here would not in fact be distributed according to the laws of Louisiana, To prevent this incongruity, the court must first enquire if the property is moveable or immoveable by the laws of the domicil, and if immoveable, then the comity does not apply from the character of the 'property, but if moveable in one state and immoveable in the other, then the want of reciprocity destroys the comity.
6. The foreign is ancillary to the local administration, and presupposes the right to administer on the same property, if at the domicil. But by the rules of the common law, immoveables are not subjected to the power of an administrator or distributable by him, and consequently an administration here on such property, could not be ah ancillary administration but wholly disconnected with the law of the domicil. 11 Mass. 264; 9 Mass. 355.
7. This comity applies only to transient and not to permanent moveables. Slaves and the plantation on which they are placed are regarded as accessory and principal; because the former are necessary to reap the products of the latter. Karnes’ Equity 552, 553; 2 Sel wins Nisi Prius 1274; note 5.
8. Slaves are not regarded as property, by the law of nations, and are not subjected to the operation of that law. They ar& created property by municipal laws, and as such controlled only by those laws. The law of the domicil does not control them. Could a Pennsylvanian in opposition to our laws, emancipate' his slaves located here, or deprive' his widow, by his will, of dower in them? Certainly not: then how could the laws of the domicil control them, which constitute the implied will of the *288 intestate? If the disposition of slaves were determined by the law of a foreign domicil, then if a Pennsylvanian died with slaves here, they would, ipso facto, be emancipated, as the laws of Pennsylvania do ,not regard slaves as property. A regard for the public safety forbids the adoption of this comity as regards slaves.
9. This comity does not extend to property, the disposition of which is forbidden by the laws of the place where situate, and by our laws the husband by his will, or by an act of emancipation, cannot deprive the wife of dower in slaves — these laws giving dower are real statutes, operating in rem, granting and securing this right of dower £> in all cases,” both ‘‘in real and personal estate.” Rev. code 32, see. 14, 40,41; sec. 45,46, 47, 48, 50, 52; p. 230, 231, 386; sec. 75.
10. The widow does not take as distributee but by a “ paramount” and “ privileged” right, and in all cases a real right superior to the law of the domicil and not controlled by it, either as regards real or personal property, as is proved by the French, English and Louisiana cases. 4 Merlins’Repertoire de jurisprudence 242; 1 Ferrier de Droit 491; Ab-ercrombie vs. Caffrey; 3 Martin N. S. 1; 1 Vernon 180; 2d Vernon 110, 111.
11. But it is said, the law of the place [Louisiana,] where the mar. riage was solemnized, must prevail. This as regards dower is contradicted by all the above cited cases and sustained by no authority. Dower is given by states, according to the law of the place where the property is situate and this law constitutes in that particular a part of the marriage contract, and no case can be found where the community principle engrafted by the civil law upon the relation of husband and wife, has been adopted in lieu of dower by any country under the empire of the •common law.